# In the United States Court of Federal Claims

No. 09-14C
Filed: January 17, 2012

\* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| RAILWAY LOGISTICS INTERNATIONAL, | \* | Breach of Contract Claim; Contract Disputes Act; Fraud Counterclaims; |
| Plaintiff, | \* | Special Plea in Fraud, 28 U.S.C. § 2514; False Claims Act, 31 U.S.C. |
| v. | \* | § 3729; CDA fraud provision, 41 U.S.C. § 7103(c)(2); Jurisdiction; |
| THE UNITED STATES OF AMERICA, | \* | Government as De Facto Plaintiff; Motion to Dismiss Counterclaims; |
| Defendant. | \* | Termination for Convenience |

\* \* \* \* \* \* \* \*

*James Stephen DelSordo*, Argus Legal, LLC, Manassas, VA, for plaintiff.

*Jonathan Reid Prouty*, United States Department of Justice, Civil Division, Washington, DC, for defendant.

## OPINION AND ORDER

**HODGES**, Judge.

This is a breach of contract case against the United States. Plaintiff Railway Logistics International (RLI) seeks over $6 million for defendant's alleged breach of contracts valued at less than $2.5 million. The Government filed fraud counterclaims against RLI based on the testimony of Mr. Frederick Simon, the owner of Railway Logistics, and others who testified on plaintiff's behalf.

RLI's claims were fraudulent in all respects. We enter judgment for defendant on its counterclaims pursuant to the False Claims Act, the Contract Disputes Act, and the Special Plea in Fraud, for the reasons and in the amounts described below.

## I. BACKGROUND

The Government awarded RLI two contracts in late 2004, to provide materials for rehabilitation of the Iraqi Republic Railway. Contract W914NS-05-M-1110 (Contract #10) covered supply and delivery of three hundred "complete wheel sets and axle boxes for Y25C bogies" valued

at $1,350,000.[1] Contract number W914NS-04-M-0018 (Contract #18) called for delivery of certain locomotive parts valued at $1,076,752.36. Contracts #10 and #18 required that RLI complete delivery of goods and services within 180 days after the effective date of the contract, which would have been during May of 2005. Problems arose with performance of the contracts almost immediately.

RLI provided the Government a small portion of the locomotive parts required under Contract #18 in August 2005, three months after plaintiff was to have completed delivery on both contracts. The contract value of the parts was $71,569.80, which defendant paid. Plaintiff assured the Government that the remaining parts were "on their way," but it made no other shipments pursuant to Contract #18.[2]

Confusion and delay surrounded performance of Contract #10 for wheel sets and axle boxes. Plaintiff asked for drawings or blueprints for the wheel sets soon after the contracts were awarded, complaining that many manufacturers provide the "Y25C wheel set" and each had different design attributes. Plaintiff claimed that it could not get price quotes from suppliers without such drawings.

Defendant responded that the wheel sets were standard, and that RLI was responsible under the contract for providing blueprints of the wheel sets, not the other way around. Plaintiff then submitted drawings to the Contracting Office for approval, with narrative portions in Polish. The Government would not sign off on these drawings. Later, the Contracting Office provided designs of wheel sets to RLI, but RLI claimed that the drawings did not comport with its contract.

Another point of confusion alleged by RLI was the contract's requirement that wheel sets be assembled upon delivery. RLI asked that the wheel sets be shipped disassembled for efficiency and for "security reasons." The Government did not object, but reaffirmed its contract requirement that the wheel sets be delivered assembled. Mr. Simon confirmed his understanding that the wheel sets were to be delivered assembled, but later disputed the assembly requirement.[3]

---

[1] Bogies are frameworks that are positioned underneath freight cars to hold axles and wheel sets in place.

[2] Plaintiff contends that the Government made unreasonable requests that the parts be certified as OEM (Original Equipment Manufacturer), or show that non-OEM parts were as good as or better than their OEM counterparts, a contract requirement. Documentation accompanying most non-OEM catalogs provide sufficient proof that non-OEM parts are equivalent to OEM or better, because such documents certify that the parts are acceptable to the manufacturer.

[3] The parties exchanged a number of emails in which defendant insisted on assembled delivery of the wheel sets, but one government official, an assistant to the contracting officer, told Mr. Simon in error that delivery of the wheel sets assembled was not necessary. However, this misstatement was corrected on the same day.

Mr. Simon advised the Contracting Office two months later, in October 2005, that the first one hundred wheel sets would be shipped within the week. This did not occur. RLI delivered fifteen wheel sets in December 2005, six months after the delivery of three hundred wheel sets was due under the contract. The fifteen wheel sets were only partially assembled. A key part of the bearing assembly, the "inner race," was not attached mechanically to the axle. The shipment did not include axle boxes as required by the contract.[4]

Plaintiff did not remedy the assembly problem for the fifteen delivered wheel sets, and it did not provide the necessary axle boxes. It did not deliver additional wheel sets. Plaintiff contended that its difficulty arose from frequent changes in the Government's Contracting Office. These excuses were not credible, however, and if true, they would not have justified plaintiff's utter failure to meet the terms of the contract.

The contracting officer issued a cure notice in February 2006. A new contracting officer, Technical Sergeant Nicola Natale, assumed responsibility for the contracts in March. She suspended the cure notice in an attempt to effect delivery of the needed items by modifying the contract. Sergeant Natale testified that the railroad equipment plaintiff had promised to deliver was important to the Government's efforts in Iraq, as the Iraqi Railroad was in desperate need of the items. Moreover, the Contracting Office was not assured of new funding for any follow-on contract should RLI fail. She proposed a compromise.

Sergeant Natale proposed that defendant would pay for the incomplete wheel sets already delivered if RLI would remedy the assembly problem. RLI would also provide a number of wheel sets representative of the amount of money remaining on the contract, provided that the remainder of the contract be completed before any payment would be issued to RLI. Despite this proviso, Mr. Simon insisted on prepayment for the incomplete wheel sets. Technical Sergeant Natale terminated the contracts for convenience in July 2006.

---

[4] Mr. Hemphill was a State Department employee who represented the United States in its dealings with the Iraqi Railway. He served as the contracting officer's technical advisor and representative for the contracts in this case. Mr. Hemphill testified that the contract term "complete wheel sets with axle boxes for Y25CS bogies" referred to a standard, common product. He had numerous communications with Mr. Simon confirming the standard and explaining why the contract required complete assembly. The wheel sets were to be a field repair item; the Government needed to be able to install a wheel set complete with axle box wherever a freight car might be. Mr. Hemphill inspected the wheel sets RLI had delivered and determined that the inner races were not pressed onto the axles as required by the contract, and the axle boxes were not included.

### Plaintiff's Damages Claim

Plaintiff's certified claim for equitable adjustments and costs at termination totaled $6,438,000. Its costs of $2.4 million were based on plaintiff's "invoices from subcontractors and vendors and [RLI's] internal accounting system." Equitable adjustments resulting from defendant's alleged delays and changes were $4.05 million, according to plaintiff's claim. The only support for plaintiff's cost claim was a spreadsheet that defendant received among its discovery documents.

RLI cited the termination for convenience provision of the Federal Acquisition Regulations as legal authority for its cost claim. That FAR provision, which was made a part of the contracts, states:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. . . . Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate . . . have resulted from the termination.

48 C.F.R. 52.212-4(l); *see also* 48 CFR 31.205-33 (Professional and consultant services costs).

Plaintiff represented that its equitable adjustment claim was reimbursement for expenses resulting from defendant's alleged changes to the manner and method of performance of the contracts, its failure to provide adequate specifications, and its lack of cooperation in plaintiff's performance of the contracts. For example, plaintiff alleged that defendant did not provide required technical specifications, and repeatedly modified the nature and method of delivery of the items to be supplied under the contract. Plaintiff had no support for these allegations.

RLI cited the Changes Clause of the FAR, also made a part of the contracts, as the legal basis for its equitable adjustments:

> The Contracting Officer may at any time, by written order, . . . make changes within the general scope of this contract . . . If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

48 C.F.R. 52.243-1(a), (b).

### Defendant's Response

The Government insists that RLI is not entitled to damages. It contends that defendant was not responsible for any aspect of the claimed delays, which were caused by RLI's failure to comply

with the terms of the contracts. Moreover, plaintiff's certified claim was fraudulent, according to the Government, and when RLI submitted the claim, it did so with knowledge that the claim was based on an overstatement of costs.[5] The Government seeks damages pursuant to the fraud provision of the Contract Disputes Act in the unsupported amount of RLI's claim. Defendant also seeks civil damages under the False Claims Act and forfeiture of plaintiff's entire claim under the special plea in fraud.

## II. DISCUSSION

Plaintiff bore the burden of proving that the Government breached its contracts and that it sustained damages as a result. It provided no evidence of a government breach of Contract #18. Plaintiff delivered locomotive parts worth less than ten percent of the contract value and despite promising that the remainder of parts due were "being loaded into containers, and [would] be dispatched shortly," no more parts were ever delivered. Mr. Simon testified that the Government had made unreasonable demands for proof of the quality of the parts beyond what the contract required, but we found no evidence of these assertions, let alone proof. The contract required original equipment manufacturer (OEM) parts or parts that were as good or better than OEM parts. The quality certifications the Government required were standard and reasonable, as Mr. Simon must have thought when he promised to deliver the parts.

RLI also failed to perform Contract #10. Plaintiff asserted pretrial that the delay in delivery of the wheel sets was caused primarily by a question of whether the wheel sets were to be delivered assembled. Mr. Simon testified that he had agreed to deliver the wheels attached to the axles and the inner race pressed onto the axle. However, the inner races were not pressed on at delivery, and the Government properly rejected the delivered goods. At trial, Mr. Simon raised the new argument that the parties had a misunderstanding over the meaning of "axle box." In addition to the assembly problem, the wheel sets were not accompanied by axle boxes. Mr. Simon knew what was expected under Contract #10, particularly after the rejection of the first fifteen wheel sets. Plaintiff made no attempt to manufacture or deliver the remaining wheel sets with axle boxes due under the contract.

---

[5]Mr. Simon was convicted of mail and wire fraud in 2008 and 2009, in part for contracting with the companies in this case – Deugro, Durox, Clark Filter, Hasler Rail, and Eagle Global Logistics – and having no intention to pay. Defendant argued that we should view Mr. Simon's convictions as conclusive evidence of plaintiff's fraud, because RLI sought compensation from the Government for payments to the same suppliers. Plaintiff should be precluded by collateral estoppel from asserting that it intended to pay those companies, defendant urged. We did not evaluate defendant's estoppel argument or consider Mr. Simon's legal relationship with plaintiff RLI, because the rulings described in this Opinion are supported by indisputable evidence of fraud as alleged in the counterclaims.

**Fraud Counterclaims**

The Government filed fraud counterclaims near the end of trial. The counterclaims seek forfeiture under the special plea in fraud and damages under the Contract Disputes Act and the False Claims Act. The court may apply any or all of the fraud statutes as appropriate and warranted. Defendant must show by clear and convincing evidence that a contractor is subject to forfeiture pursuant to the special plea in fraud. *UMC Elecs. Co. v. United States*, 249 F.3d 1337, 1338-39 (Fed. Cir. 2001). Otherwise, defendant's burden is preponderance of the evidence. *See* 31 U.S.C. 3731(d); *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998). In this case, plaintiff's liability is clear by any standard; the nature of defendant's burden is not an issue.

RLI's six million dollar certified claim to the contracting officer did not include an itemization of its costs. Defendant found a spreadsheet in discovery that approximated the amount of the claim when totaled. Justice Department counsel asked Mr. Simon about the spreadsheet during trial, and he testified that the six million dollar figure was based on calculations from the spreadsheet that plaintiff had supplied during discovery. Mr. Simon added, however, that the spreadsheet was a "rough estimate." The spreadsheet listed vendors and consultants to whom RLI allegedly owed various payments for goods and services, and the document was discussed at length during trial. Mr. Simon's testimony on direct and cross established conclusively that the spreadsheet was replete with exaggerated or fabricated figures.

The Spreadsheet

The document referred to by RLI as a spreadsheet became crucial evidence in this case, though not in support of plaintiff's claim. It provided defendant a powerful justification for its late counterclaims, and it persuaded the court to allow them.[6] More importantly, the spreadsheet established without a doubt that plaintiff had committed or attempted to commit fraud against the United States.

The spreadsheet lists a payable of $831,000 to the wheel sets manufacturer, RAFIL GmbH. Oddly, the record does not show how much RAFIL billed plaintiff Railway Logistics for the wheel sets; that information was not offered into evidence and no one from RAFIL testified. But Mr. Simon acknowledged on cross-examination that he did not receive bills from RAFIL in the amounts listed on the spreadsheet. Mr. Simon also admitted that RAFIL used the raw materials it produced for the RLI contract on projects for its other customers.

Deugro is the company that RLI hired to deliver the wheel sets pursuant to Contract #10. Mr. Simon testified that RLI incurred approximately $8,000 in costs from its delivery contract with Deugro. The spreadsheet lists delivery costs of $25,000 owed to a company shown as Deugro, GmbH.

---

[6] Plaintiff did not object to defendant's motion to amend its Answer to include counterclaims.

The spreadsheet shows a $195,000 payable to Double Eagle, MC. Plaintiff provided no support for this debt, or any indication of the goods or services that it supplied. Double Eagle, MC is owned by Mr. Simon.

RLI listed a debt of $35,000 on the spreadsheet, owed to Eagle Global Logistics. Mr. Simon testified that Eagle Global was the shipper of materials delivered pursuant to Contract #18. An invoice from Eagle Global was offered into evidence, and it is in the record of trial. The invoice shows that RLI incurred costs of $8,616 for Eagle Global's delivery services.

Costs of $15,000 are listed on the spreadsheet for a company called Kit, GmbH. Mr. Simon testified that this was a consulting company that plaintiff hired to communicate directly with the Iraqi Railway. This consulting company did manage to obtain from the Iraqi Railway the technical information RLI needed, according to Mr. Simon. Evidently, this technical information still was not sufficient to resolve RLI's expressed confusion regarding its requirements under Contract #10. In any case, RLI owed that company only $5,000 for its consulting services.

Plaintiff's spreadsheet lists $150,000 owed to a Mr. Rieckenberg. Mr. Simon testified that Mr. Rieckenberg was a salesman who coordinated dialogue among plaintiff RLI and the companies responsible for manufacture and delivery of the wheel sets. Plaintiff offered as evidence an invoice showing $147,059 allegedly owed to Mr. Rieckenberg.

A company called Hasler-Secheron, also referred to as Hasler, is listed on the spreadsheet for services valued at $250,000. According to invoices, RLI owed the company $200,355. Mr. Simon testified that Hasler did not supply any product or service under Contract #18.

Plaintiff listed $225,000 on the spreadsheet for a company called Triangle. Triangle's only connection with RLI or its contract with the Government was its agreement to deliver a compressor worth $9,300 to RLI. Triangle delivered the compressor to RLI as agreed, and the Government paid RLI $9,300 for the compressor when it was delivered. Mr. Simon indicated that two additional compressors were built by Triangle, but these were not delivered to the Government. At most, RLI would have owed Triangle $27,900 for three compressors.

Durox charged RLI $5,469 for gaskets under Contract #18. The Government paid RLI for the Durox supplies, but we could not determine that RLI paid Durox. The spreadsheet shows that RLI owes Durox $10,000, an amount that plaintiff is seeking from defendant in its claim.

The spreadsheet shows that RLI is indebted to Clark Filter in the amount of $30,000 for filters that it supplied pursuant to Contract #18. Clark Filter actually charged RLI $27,893 for the filters, and defendant reimbursed RLI for that invoice. RLI did not pay any amount to Clark Filter.

The spreadsheet shows that Mr. David Lee worked as a consultant on the job for $182,000. Mr. Lee was employed by Double Eagle Management Company; he served as RLI's local representative in Baghdad after issuance of the cure notice. He testified from Baghdad through a

videoconferencing service regarding his meetings with Sergeant Natale on behalf of RLI. Plaintiff produced pay vouchers for Mr. Lee from January 2006 through July 2006. However, Sergeant Natale did not begin work at the Project Contracting Office until March 2006. She met with Mr. Lee for the first time in May 2006. Vouchers that plaintiff submitted for Mr. Lee's services May through July total $105,000.

Mr. Jim Furland also served as a consultant to RLI, primarily after the cure notice. The spreadsheet lists $300,000 owed to him for efforts to respond to the cure notice. He testified that his work for RLI included researching the Federal Acquisition Rules, communicating with the contracting officer by telephone, and submitting a report to the Special Inspector General for Iraq Reconstruction. Mr. Furland was to be paid $3,500 per week for these duties, according to Mr. Simon. Mr. Furland's testimony was marginally credible and his experience as described was mostly irrelevant. We viewed testimony regarding amounts of and justification for his salary as unlikely.

The document lists a $600,000 payable to Mr. Simon himself, for salary. Another $300,000 is listed as salary for his father, Manfred Simon, whose duties were to keep the books and handle the accounting for RLI. The spreadsheet lists $5,000 owed to a Mr. John Guin, $10,000 owed to a company called ePower, and $150,000 for miscellaneous suppliers. The final item on the spreadsheet was $3 million for lost business, an amount withdrawn by RLI on the first day of trial. Plaintiff provided no support for any of these costs during trial or in the pleadings.

## Fraud Statutes

The Government seeks forfeiture of plaintiff's claim under the special plea in fraud statute:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. Defendant must prove, by clear and convincing evidence, that plaintiff has misrepresented material facts with the intent to deceive the Government. *UMC Elecs.*, 249 F.3d at 1338-39. The Government need prove only that a portion of the contractor's claim is false to obtain forfeiture of the entire claim.[7]

The Contract Disputes Act contains a fraud provision stating,

---

[7] We have no doubt that plaintiff RLI committed or attempted to commit fraud against the United States in submitting a claim based upon overestimations of costs. Substantial parts of the claim cannot be supported because of such misrepresentations of fact and fraud. If any part of the claim were deemed to be valid – a finding that we have not made – that amount would be forfeited to the United States in accordance with 28 U.S.C. § 2514.

> [i]f a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C. § 7103(c)(2) (formerly codified at 41 U.S.C. § 604). As noted herein, plaintiff could not support its claim because of fraud and misrepresentation of fact.

The False Claims Act provides civil penalties against a contractor who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). Where fraud has occurred, the contractor is liable to the United States for a civil penalty of up to $11,000 for each false claim. *Id.*[8]

On the first day of trial, plaintiff informed the court that it would not seek $3 million in lost business alleged in the Complaint and made a part of the $6.4 million certified claim to the contracting officer. It also retreated somewhat from the claim's only documentary support: the spreadsheet. Mr. Simon testified that the spreadsheet on which the $6.4 million claim was based was "an internal document which kind of gives a brief overview of what has been done in support of the two contracts." He said it was "a rough estimate." Plaintiff's strategic withdrawal continued post-trial.

RLI argued post-trial that its actions did not rise to the level of fraud – at most, perhaps it could be charged with poor record-keeping. Plaintiff also seemed to revise post-trial its alleged costs to include only the amount due for the fifteen delivered wheel sets and the costs incurred for the salaries of its consultants, Mr. Lee and Mr. Furland. These costs totaled less than $1 million. However, RLI presented a certified claim to the contracting officer for over $6 million, and swore that the amount of the claim was what it "then honestly believe[d] is due." *J.F. Shea Co. v. United States*, 4 Cl. Ct. 46, 54 (1983).

If we accepted plaintiff's contention that $3 million of the claim for lost business could be overlooked because it was withdrawn on the first day of trial, plaintiff fraudulently overstated its costs by at least $1.8 million. Each number on the spreadsheet was inflated. Costs from Deugro were overestimated by $17,000. The company that manufactured the wheel sets, RAFIL, was listed as owed $831,000. Mr. Simon delivered fifteen nonconforming wheel sets. To the extent that the

---

[8]The False Claims Act provides for treble damages in instances where the Government has paid a false claim. 31 U.S.C. § 3729(a)(1)(G). That provision is not applicable here because the payments defendant made for plaintiff's partial fulfillment of Contract #18 were for parts received by the Government.

9

Government might have agreed to pay something for those wheel sets, it would have paid no more than $67,500.[9]  The RAFIL charges are therefore inflated by at least $763,500.

RLI's claim inflated the amount owed to Eagle Global Logistics by a factor of four, an excess of $26,384; it tripled the amount owed Kit, GmbH, a $10,000 overage; and Hasler's $250,000 was inflated by $49,645.  The $225,000 claimed for Triangle was overstated by $197,100.  Durox's payable listed as $10,000 was inflated by $4,531.  The claim included $30,000 allegedly owed to Clark Filter.  In fact, Clark charged RLI $27,893, and the Government reimbursed RLI in full for Clark Filter's bill.  This created an overstatement of $30,000 by RLI.

Mr. Lee's expenses were inflated by at least $77,000 – the amount he billed for the months January through April 2006, before he started working on the contracts.  These fraudulent overstatements total $1,175,160.

RLI owed Mr. Furland $300,000, according to the spreadsheet.  He testified that he began work after the cure notice.  His said that he performed some work on the contracts, but $300,000 for his services was clearly an overstatement.  Plaintiff provided no explanation or support for other costs listed on the spreadsheet, including $195,000 to Double Eagle Management Company, another company owned by Mr. Simon, $150,000 for miscellaneous suppliers, $5,000 to John Guinn, $10,000 for ePower, and salaries of $600,000 for Mr. Simon and $300,000 Mr. Simon's father, Manfred Simon.

The Government limited its counterclaims to amounts that are directly contrary to invoices in evidence and costs that are obviously and grossly inflated.[10]  These total $1,175,160 that cannot be supported because of "a misrepresentation of fact or fraud by the contractor."  41 U.S.C. § 7103(c)(2).

Submitting fraudulent claims to a contracting officer implicates the False Claims Act penalty of $5,500 - $11,000 per claim.  31 U.S.C. § 3729(a)(1)(G).  Any amount of RLI's claim that might have been valid, or could have remained after applying statutory penalties, would be forfeited pursuant to the special plea in fraud.  28 U.S.C. § 2514.

---

[9]Technical Sergeant Natale testified that the Government would have been willing to pay $67,500 for the delivered wheel sets if RLI could have remedied the assembly problems and completed the contract.

[10]The Government sought damages for overstatements of amounts owed to a consultant Mr. Rieckenberg.  We found the analysis of Mr. Rieckenberg's invoices to be inconclusive.  Further, the invoices were in euros, and no testimony was offered on the euro to dollar exchange rate at the time.

### III. PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

The Government filed fraud counterclaims after most of the witnesses had testified. Only one day of trial remained. Plaintiff's response was a motion to dismiss the counterclaims on jurisdictional grounds. We denied plaintiff's motion from the Bench, but stated that this Opinion would address the matter further.

Plaintiff argued that this court lacks subject matter jurisdiction of defendant's counterclaims alleging fraud because we do not provide an opportunity for a trial by jury. Plaintiff noted that the historical test for determining the existence of a right to trial by jury was whether the action before a court in eighteenth-century England lay in law, as opposed to equity, and whether the decision must fall to the jury to preserve the substance of the right. Normally in such circumstances, parties have a Constitutional right to trial by jury in this country. *See, e.g.*, *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708 (1999). Common law fraud is an action for damages in tort, plaintiff urges, and such cases require the opportunity for a jury trial under the Constitution.

RLI acknowledged that the Government as party-defendant may deprive individuals of jury trials as a condition of its waiver of sovereign immunity. *See, e.g.*, 28 U.S.C. § 2402 ("[A]ny action against the United States under section 1346 shall be tried by the court without a jury . . . ."). The Court of Appeals for the Federal Circuit has held that government contractors, having availed themselves of Contract Disputes Act procedures, waive their Seventh Amendment right to a jury trial. *See, e.g.*, *Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990). However, plaintiff contends that Federal Circuit precedent does not address this situation, where arguably the United States loses its claim to sovereign immunity because it seeks to become a de facto party-plaintiff.

The Supreme Court held in *McElrath v. United States* that government counterclaims in the Court of Claims were not controlled by the Seventh Amendment because of the conditions that Congress placed on the Government's waiver of sovereign immunity. 102 U.S. 426, 440 (1880). The Federal Circuit quoted *McElrath* at some length in support of its ruling in *Seaboard*, concluding that an Article I court could adjudicate questions of fact related to government counterclaims despite the absence of a jury:

> The government cannot be sued, except with its own consent. It can declare in what court it may be sued, and prescribe the forms of pleading and the rules of practice to be observed in such suits. It may restrict the jurisdiction of the court to a consideration of only certain classes of claims against the United States. Congress . . . informs the claimant that if he avails himself of the privilege of suing the government in the special court organized for that purpose, he may be met with a set-off, counter-claim, or other demand of the government, upon which judgment may go against him, without the intervention of a jury . . . . If the claimant avails himself of the privilege thus granted [to sue the sovereign], he must do so subject to

11

the conditions annexed by the government to the exercise of the privilege. *Nothing more need be said on this subject.*

*Seaboard*, 903 F.2d at 1567 (quoting *McElrath*, 102 U.S. at 440) (emphasis added).

### IV. CONCLUSION

Railway Logistics could not support its claim because of fraud and misrepresentation of fact. Every item on the spreadsheet that served as plaintiff's support for its claim was overstated or imaginary. Contents of the spreadsheet alone provide clear and convincing evidence that RLI practiced fraud "against the United States in the proof, statement, establishment, or allowance" of its claim. 28 U.S.C. § 2514.

Trial of this case revealed that defendant's business relationship with RLI had no redeeming aspect; it caused a grievous waste of limited resources and hindered the Government's rebuilding efforts in Iraq. RLI was in obvious breach of both contracts, yet defendant terminated them for convenience of the Government. This would have allowed plaintiff to walk away with little or no cost to itself, yet it sued the Government for millions of dollars on a specious claim, thereby creating still more waste of valuable time and resources.

The Government limited its counterclaims to the most obvious and outrageously inflated fraudulent claims. Given that restraint, the category of claims that RLI could not support because of "misrepresentation of fact or fraud by the contractor" totaled $1,175,160. *See* 41 U.S.C. § 7103(c)(2). The statutory penalty for submitting fraudulent claims to a contracting officer ranges from $5,500 to $11,000 per claim. *See* False Claims Act, 31 U.S.C. § 3729. Plaintiff does not qualify for treble damages pursuant to the False Claims Act because "damages" are calculated according to the number of fraudulent claims that are paid by the Government. Thanks to Technical Sergeant Nicola Natale and her Program Contracting Office, defendant did not pay any of RLI's fraudulent claims.

Any amount of RLI's claim that might have been valid, or could have remained after applying statutory penalties would be forfeited pursuant to the special plea in fraud. 28 U.S.C. § 2514. Statements contained in the spreadsheet alone support a finding, by clear and convincing evidence, that plaintiff attempted to practice a fraud "against the United States in the proof, statement, establishment, or allowance" of its claims. *Id.*

The Clerk of Court will enter judgment for the United States in the amounts of $1,175,160 pursuant to 41 U.S.C. § 7103(c)(2); and $11,000 pursuant to 31 U.S.C. § 3729, for a total of $1,186,160. Costs to defendant, including those attributable to the expenses of reviewing plaintiff's claim and other amounts available pursuant to 41 U.S.C. § 7103(c)(2).

SO ORDERED.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge
